**JENNIFER DAVENPORT**
**Attorney General of New Jersey**
JEREMY M. FEIGENBAUM
Solicitor General
MAYUR P. SAXENA*
Assistant Attorney General
JOSHUA P. BOHN*
BRYCE K. HURST*
AMANDA I. MOREJON*
ESTEFANIA PUGLIESE-SAVILLE*
Deputy Attorneys General
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
Telephone: (609) 969-5365
Email: Mayur.Saxena@law.njoag.gov
*Attorneys for the State of New Jersey*

*Additional Counsel Listed on Signature
Page*

**ROB BONTA**
**Attorney General of California**
NELI PALMA (CA Bar No. 203374)
Senior Assistant Attorney General
NIMROD PITSKER ELIAS (CA Bar No. 251634)
Supervising Deputy Attorney General
SEAN C. MCGUIRE (CA Bar No. 319521)
HILARY A. BURKE CHAN (CA Bar No. 347754)
MARNIE G. GANOTIS (CA Bar No. 206178)
Deputy Attorneys General
California Department of Justice
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: (619) 738-9543
Sean.McGuire@doj.ca.gov
*Attorneys for the State of California*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEW JERSEY; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; JOSH SHAPIRO, in his official capacity as Governor of the COMMONWEALTH OF PENNSYLVANIA; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br> Plaintiffs, | Case No. _____ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br><br> Date: <br> Time: <br> Dept: <br> Judge: <br> Trial Date: <br> Action Filed: |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; DR. MEHMET OZ, in his official capacity as Administrator for the CENTERS FOR MEDICARE AND MEDICAID SERVICES; and CENTERS FOR MEDICARE AND MEDICAID SERVICES,

Defendants.

Plaintiffs the State of California, State of New Jersey, State of Arizona, State of Colorado, State of Connecticut, State of Delaware, State of Illinois, State of Maine, State of Maryland, Commonwealth of Massachusetts, State of Michigan, State of Minnesota, State of Nevada, State of New Mexico, State of New York, State of Oregon, Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania, State of Rhode Island, State of Vermont, Commonwealth of Virginia, State of Washington, and State of Wisconsin (the Plaintiff States) bring this civil action against Defendants Robert F. Kennedy, Jr., in his official capacity as Secretary of the U.S. Department of Health and Human Services; the U.S. Department of Health and Human Services; Dr. Mehmet Oz, in his official capacity as Administrator of the Centers for Medicare & Medicaid Services; and the Centers for Medicare & Medicaid Services (Defendants) and allege the following:

**INTRODUCTION**

1.      Congress enacted the Patient Protection and Affordable Care Act (ACA) in 2010 to increase the number of Americans with health insurance and decrease the cost of healthcare. Between 2020 and 2025, enrollment in the ACA health insurance marketplaces doubled, and over 24 million people signed up for health insurance coverage through the ACA marketplaces for plan year 2025.

2.      However, in 2025, Defendants, the U.S. Department of Health and Human Services (HHS) and one of its sub-agencies, the Centers for Medicare and Medicaid Services (CMS), issued an unlawful regulation (*Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability*, 90 Fed. Reg. 27,074 (June 25, 2025) (the 2025 Rule)) designed to make health insurance significantly more expensive and harder to obtain. By their own estimates, Defendants expected the 2025 Rule to decrease enrollment by up to two million people and significantly increase the costs incurred by Plaintiff States in providing healthcare.

3.      That is, in fact, what happened: After the 2025 Rule became effective, enrollment in the ACA's marketplaces experienced the steepest decline in the ACA's history. During open enrollment for plan year 2026, 23.1 million people enrolled in coverage, down from an all-time high of 24.3 million in open enrollment for plan year 2025. That is a decline of 1.2 million, or

1

nearly five percent of all ACA enrollees.

4. That decline occurred even though a federal court blocked several of the 2025 Rule's provisions from taking effect because they violated the Administrative Procedure Act (APA). Had all provisions taken effect as Defendants intended, the drop in enrollment caused by the 2025 Rule would have been even more severe.

5. Now, Defendants have again announced sweeping and harmful changes to the regulations that govern the ACA's marketplaces. The new regulation, titled *Patient Protection and Affordable Care Act, HHS Notice of Benefit and Payment Parameters for 2027; and Basic Health Program*, 91 Fed. Reg. 29,526 (May 20, 2026) (the 2026 Rule), imposes burdensome requirements upon states and their agencies and regulators.

6. Like the 2025 rule, the 2026 Rule will decrease enrollment and increase costs for millions of Americans who rely on the ACA to afford health coverage for themselves and their families. Defendants estimate that the 2026 Rule will decrease enrollment by up to five million people from 2026-2030, with two million of those enrollment losses occurring in 2027. 91 Fed. Reg. at 29,856.

7. And also like the 2025 Rule, the 2026 Rule contains multiple unlawful and arbitrary provisions.

8. *First*, the 2026 Rule re-imposes four provisions that repeat almost verbatim the same provisions that a federal court already vacated upon finding them unlawful and arbitrary: the failure-to-reconcile provision, two income-verification provisions, and the special enrollment period income verification provision. *See City of Columbus v. Kennedy*, No. CV 25-2114-BAH, 2026 WL 1707125, 2026 U.S. Dist. LEXIS 130984 (D. Md. June 12, 2026) (*City of Columbus I*). These provisions are as unlawful and arbitrary now as they were in the 2025 Rule, and Defendants' attempt to impose them again fails for the same reasons.

9. *Second*, the 2026 Rule imposes new unlawful provisions that will damage the ACA's single risk pool, shift costs onto enrollees, and impose substantial burdens on states. The 2026 Rule expands eligibility for enrollment in barebones "catastrophic" plans far beyond the eligibility limits for those plans imposed by the ACA. The 2026 Rule also unlawfully increases

2

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

the limits on maximum out-of-pocket cost-sharing to levels that exceed the statutory maximum by thirty percent for both catastrophic and bronze-tier plans.

10. These changes are contrary to the text and purpose of the ACA and will inexorably lead to higher costs and lower enrollment for consumers, higher uncompensated care costs for providers and state agencies, and substantial compliance costs for state-based exchanges. Plaintiff States that operate their own ACA exchanges will incur, and are already incurring, unrecoverable compliance costs as they prepare for the possibility that they will have to implement these unlawful provisions. Plaintiff States will also lose tax revenue derived from decreased insurance plan sales through state exchanges and will incur increased expenses providing healthcare to newly uninsured individuals. And Plaintiff States' newly uninsured residents will suffer firsthand the harm caused by the lack of access to necessary, affordable healthcare that the ACA was designed to provide, while the cost of their care falls on the states.

11. Because the 2026 Rule's changes are contrary to law, arbitrary and capricious, and harmful to Plaintiff States, their marketplaces, and their residents, the States bring this suit to have the unlawful provisions of the 2026 Rule vacated under the APA—thereby protecting access to high quality and affordable healthcare for millions of our residents—and to enjoin Defendants from imposing these unlawful provisions on Plaintiff States.

## JURISDICTION AND VENUE

12. This Court has jurisdiction under 28 U.S.C. § 1331 because this action "aris[es] under the . . . laws . . . of the United States."

13. This action is reviewable under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

14. Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1)(B) and (C).

## PARTIES

15. Plaintiff the State of California is a sovereign state of the United States of America. It is represented by Attorney General Rob Bonta, the chief law officer of California.

16. Plaintiff the State of New Jersey, represented by and through its Attorney General, Jennifer Davenport, is a sovereign state of the United States of America. As the state's chief legal

3

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

officer, the Attorney General is authorized to act on behalf of the state in this matter.

17.    Plaintiff the State of Arizona, represented by and through its Attorney General Kris Mayes, is a sovereign state of the United States of America. Attorney General Mayes is Arizona's chief legal officer and is authorized to pursue this action on behalf of the State of Arizona. *See* A.R.S. § 41-193(A).

18.    Plaintiff the State of Colorado, represented by and through its Attorney General Phil Weiser, is a sovereign state in the United States of America. The Attorney General acts as the chief legal representative of the state and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

19.    Plaintiff the State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

20.    Plaintiff the State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

21.    Plaintiff the State of Illinois is a sovereign state in the United States of America. Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief law enforcement officer of Illinois and authorized to sue on the State's behalf. Under Illinois law, the Attorney General is authorized to represent the State's interests by the Illinois Constitution, article V, section 15. *See* Ill. Comp. State. 205/4.

22.    Plaintiff the State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

23.    Plaintiff the State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown who is the chief legal officer of

4

Maryland.

24.     Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States. Massachusetts is represented by Attorney General Andrea Joy Campbell, the Commonwealth's chief law enforcement officer.

25.     Plaintiff the State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

26.     Plaintiff the State of Minnesota is a sovereign state of the United States. Minnesota is represented by and through its chief legal officer, Minnesota Attorney General Keith Ellison, who has common law and statutory authority to sue on Minnesota's behalf.

27.     Plaintiff State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign state within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

28.     Plaintiff the State of New Mexico, represented by and through its Attorney General, Raúl Torrez, is a sovereign state of the United States of America. As the State of New Mexico 's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

29.     Plaintiff the of New York, represented by and through its Attorney General Letitia James, is a sovereign state of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

30.     Plaintiff the State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

31.     Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring

5

suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6), 732-303.

32.    Plaintiff the State of Rhode Island, represented by and through its Attorney General Peter Neronha, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on its behalf of the State in this matter.

33.    Plaintiff the State of Vermont is a sovereign state of the United States of America. Vermont is represented by Attorney General Charity Clark. Attorney General Clark is authorized to initiate litigation on Vermont's behalf.

34.    Plaintiff the Commonwealth of Virginia is a sovereign state of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2-513.

35.    Plaintiff the State of Washington, represented by and through its Attorney General Nicholas Brown, is a sovereign State of the United States of America. The Attorney General is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030 to pursue this action.

36.    Plaintiff the State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Joshua L. Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized under Wis. Stat. § 165.25(1m) to pursue this action on behalf of the State of Wisconsin.

## BACKGROUND

### I.    CONGRESS PASSES THE AFFORDABLE CARE ACT TO MAKE HIGH-QUALITY AND AFFORDABLE HEALTH INSURANCE AVAILABLE TO MORE AMERICANS

37.    The ACA is a landmark law that has made affordable health coverage available to millions of Americans, reducing the number of Americans without health insurance. The ACA was designed to "increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) (*NFIB*). The ACA adopted a "series of interlocking reforms" to achieve these goals. *King v. Burwell*, 576 U.S.

6

473, 478 (2015). At a high level, the ACA requires insurers to cover all eligible applicants, thus ending the longstanding practice of discrimination against those with preexisting conditions. *See* 42 U.S.C. §§ 300gg-1, 300gg-3 (guaranteeing coverage for those with preexisting conditions). To help pay for that requirement, the ACA appropriates billions of dollars to provide subsidies designed to make health insurance more affordable. 26 U.S.C. §§ 36B.

38.     To implement these reforms, the ACA created exchanges that allow people to shop for, compare, and purchase insurance plans. Since plan year 2014, consumers and small businesses in every state have been able to obtain health coverage via exchanges operated by the states (state-based exchanges, or SBEs), or pursuant to the exchange operated by the federal government (the federally facilitated exchange, or FFE),[1] or through a state's small group off-exchange market. There are currently 24 SBEs, with the remaining 26 states using the FFE.[2]

39.     Individual consumers and small businesses seeking health coverage via an exchange typically sign up during the open enrollment period (OEP). In addition to the OEP, there are special enrollment periods (SEPs), during which consumers who experience certain life events (like a change in their family status or financial circumstances) may enroll in health coverage at other times of the year. Historically, such SEP enrollments did not require independent verification by the exchanges; an enrollee's attestation that they qualified was sufficient.

40.     Nationwide, more than 23 million Americans signed up for health coverage through the ACA's exchanges for plan year 2026.

41.     Healthcare expenses (for those with health insurance) generally fall into two categories. First, health insurance companies typically charge monthly premiums for the coverage that they provide. Second, insurance plans usually require insured individuals and families to

---

[1] The Plaintiff States utilizing the federally facilitated exchange are Arizona, Delaware, Michigan, and Wisconsin.

[2] Of the 24 SBEs, three rely on HHS to perform certain exchange functions (typically eligibility and enrollment), and consumers enroll in coverage through healthcare.gov. These SBEs that rely on the federal platform (SBE-FPs) retain responsibility for all other marketplace functions. Of the three SBE-FPs, one is seeking to transition away from the federal platform for plan year 2027 (Oregon) and another for plan year 2028 (Oklahoma). *See State-based Exchanges*, CMS.gov (Apr. 7, 2026), https://tinyurl.com/mu5aev8a.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

make out-of-pocket payments to healthcare providers in the form of copayments for medical visits and prescription drugs, coinsurance, and deductibles (known as "cost-sharing" requirements).

42.    To make these healthcare expenses more affordable, the ACA permanently appropriated billions of dollars in federal subsidies for eligible low- and moderate-income Americans. The ACA provides premium tax credits (PTCs) that reduce monthly insurance premiums for eligible individuals who seek health coverage via an Exchange. 26 U.S.C. § 36B. Individuals who qualify for the PTCs are those with household incomes between 100% and 400% of the federal poverty level (FPL). 26 U.S.C. § 36B(c)(1)(A). Such individuals may purchase insurance with the PTCs—which the Secretary of the Treasury may pay in advance, at plan sign-up, directly to the individual's health insurer. Credits paid in advance in this manner are known as advance PTC, or APTC. These crucial ACA provisions involve billions of dollars in spending each year to make health insurance more affordable for tens of millions of people. Of the 23 million Americans who signed up for health coverage through the exchanges during the OEP for 2026, the vast majority (87 percent) qualified for PTC and received at least partially subsidized coverage.[3] In 2025, 93 percent of the 23.4 million ACA enrollees qualified for PTC and received some level of subsidized coverage.[4]

43.    PTC awards are based on projections of future income. For many years, CMS required individuals to reconcile their claimed APTC amount against their actual eligibility as determined by their tax filings. If the enrollee earned more than projected and thus collected more APTC than they should have, they owed the difference back to the government in the form of a tax liability, though such liability was capped depending on the consumer's income. If the enrollee failed to file taxes and reconcile their claimed APTC award against their actual

[3] *See* Centers for Medicare & Medicaid Services, Health Insurance Exchanges 2026 Open Enrollment Report at 13, https://www.cms.gov/files/document/health-insurance-exchanges-2026-open-enrollment-report.pdf (Last accessed July 31, 2026).

[4] *See* Bernadette Fernandez, Congressional Research Service, Enhanced Premium Tax Credit and 2026 Exchange Premiums: Frequently Asked Questions (Dec. 10, 2025), https://www.congress.gov/crs-product/R48290 (Last accessed July 31, 2026).

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

eligibility, this was known as a failure to file and reconcile, or FTR. However, in 2026, the FTR regulation was vacated as unlawful by a federal court. *See City of Columbus I*, 2026 U.S. Dist. LEXIS 130984 at *59-*65.

44.    Another method by which the ACA reins in healthcare costs is by requiring that plans sold on the exchanges comply with maximum annual limits on cost-sharing, such as copays and deductibles, due from the enrollee over the plan year. *See* 42 U.S.C. § 18022. This maximum out-of-pocket (MOOP) limit caps the amount an individual must pay for covered medical services in a year. The limit on cost-sharing applies to enrollees who seek coverage both via ACA exchanges and the off-exchange market.

45.    Most plans sold on the exchanges fall into bronze, silver, gold, and platinum tiers (*i.e.*, metal-level tiers) based on how much of an average consumer's expected medical cost will be paid by the plan. Bronze plans must cover 60 percent of the expected cost; silver plans, 70 percent; gold plans, 80 percent; and platinum plans, 90 percent. 42 U.S.C. § 18022(d)(1). Higher-tier plans typically have higher premiums and lower out-of-pocket costs. Lower-tier plans have the opposite: lower premiums and higher out-of-pocket costs.

46.    Beyond bronze, silver, gold, and platinum tiers of coverage, the ACA also allows insurers to offer catastrophic plans which offer only bare minimum coverage: preventive care and three primary care visits annually before the enrollee meets their MOOP for the year. 42 U.S.C. § 18022(e)(1). Individuals enrolled in a catastrophic plan are not eligible for PTCs or cost-sharing reductions. 26 U.S.C. § 36B(c)(3)(A). Congress limited use of these plans only to rare circumstances. The statute makes catastrophic plans available only to individuals under the age of 30 or who are certified as exempt from the individual mandate either because of a hardship—such as a natural disaster—or because standard plans are unaffordable in their area. *See* 42 U.S.C. § 18022(e); 26 U.S.C. § 5000A(e)(5).

II.    **DEFENDANTS PROMULGATED AN UNLAWFUL ACA REGULATION IN 2025, WHICH A FEDERAL COURT BLOCKED IN EARLY 2026**

47.    Last year, Defendants published the 2025 Rule.

48.    Despite the ACA's goal to "increase the number of Americans covered by health

9

insurance and decrease the cost of health care," *NFIB*, 567 U.S. at 538, the 2025 Rule made enrollment (including automatic reenrollment) in health plans more burdensome and difficult rather than less: it shortened the OEP, imposed significant new paperwork verification requirements, doubled the frequency with which consumers must prove their eligibility for previously awarded premium tax credits, newly allowed insurers to deny new coverage on account of past-due premiums (even *de minimis* amounts), made annual automatic reenrollment much more difficult, imposed an unlawful $5 monthly charge on automatic re-enrollees, who by law were entitled to pay $0 premiums, and more.

49.    When proposing the 2025 Rule, Defendants predicted that it would cause between 750,000 and 2 million individuals to lose coverage. *Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability*, 90 Fed. Reg. 12,942, 13,025 (Mar. 19, 2025) (2025 Proposed Rule). Their prediction was accurate: after the 2025 Rule took effect in August 2025, total enrollment across all ACA exchanges nationwide for Plan Year 2026 declined by five percent, or 1.2 million people.[5]

50.    Defendants claimed that these burdens were justified by supposed elevated levels of fraud on the ACA exchanges. But a federal court found that explanation to be almost entirely incorrect. Accordingly, the Court held that several provisions of the 2025 Rule were unlawful and vacated them under the APA. *City of Columbus I*, 2026 U.S. Dist. LEXIS 130984. Without curing any of the deficiencies raised by the *City of Columbus* court, the 2026 Rule contains the following provisions that are almost identical to those in the 2025 Rule.

A.    **75% Verification for Special Enrollment Period Applicants on the Federal Exchanges**

51.    While most consumers enroll in coverage during the OEP, SEPs allow people to enroll in health insurance outside of the OEP if they have experienced a qualifying event, such as a change in marital status, the birth or adoption of a child, a move to a new area, or the loss of

---

[5] *Open Enrollment Marketplace Plan Selections, 2014-2026*, KAISER FAMILY FOUNDATION, https://www.kff.org/affordable-care-act/state-indicator/open-enrollment-marketplace-plan-selections/ (Last accessed July 31, 2026).

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

minimum essential coverage (often due to a job loss or aging out of a parent's coverage). To ensure that the occurrence of the qualifying event does not cause the enrollee and the enrollee's family to lose their health coverage, the ACA allows an enrollee in such circumstances to enroll in, or switch, coverage outside of the OEP. 45 C.F.R. § 155.40.

52. The 2025 Rule required all exchanges on the federal platform to verify eligibility for at least 75% of SEP enrollments. Experts predicted that the 75% verification requirement would result in healthier enrollees failing to comply with the verification requirements, and then dropping coverage, leaving sicker enrollees in the risk pool, driving up premiums and leading to coverage losses. 90 Fed. Reg. at 27,149.

53. The court in *City of Columbus I* vacated this provision as arbitrary and capricious agency action, finding that it was "unmoored from the problem it seeks to address" because "Defendants have offered no current data, reports, or evidence establishing that any 'misuse and abuse' of SEPs . . . stems from SEP enrollment *in particular*," and that Defendants' "rationale was not indicative of reasoned decision-making." *City of Columbus I*, 2026 U.S. Dist. LEXIS 130984 at *53-*54.

**B.      Income Verification Provisions When IRS Data Contradicts Applicant's Attestation, or When IRS Data is Absent**

54. The *City of Columbus I* decision also vacated two provisions of the 2025 Rule that pertain to income verification because the court concluded they were both arbitrary and capricious.

55. Before enrollees can sign up for subsidized coverage, they need to attest to their expected income for the coming year. This is because ACA marketplace enrollment is not open to those with incomes below 100% of the federal poverty level—they are generally covered by Medicaid instead—and because the amount of PTC an enrollee will qualify for is determined in part by household income. CMS checks income data submitted by the applicant against the applicant's household income as shown in their most recent tax filings. Under previous regulations, if the Internal Revenue Service (IRS) had no data on the applicant, the applicant's attestation of income would be accepted with no further verification required. *See* 91 Fed. Reg. at

11

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

29,613-14 (describing previous process under 45 C.F.R. § 155.320(c)).

56.     The 2025 Rule required all exchanges to generate and resolve a "data-matching issue" (DMI) if data from the IRS or from other "trusted data sources" was unavailable (the "missing-data DMI"). 90 Fed. Reg. at 27,130. That DMI would have to be resolved before the applicant could enroll in coverage. Last year's missing-data DMI was expected to cost the state exchanges $62.8 million in annual verification costs and $16.6 million in one-time system update costs. *See* 90 Fed. Reg. at 27,186; 90 Fed. Reg. at 27,200 (2025 Rule impact estimate). Further, HHS estimated it was likely to generate enrollment roadblocks for 2.1 million would-be enrollees annually. *See* 90 Fed. Reg. at 13,002 (2025 Rule impact estimate).

57.     The 2025 Rule also required exchanges to generate and resolve a DMI if the applicant attested to household income at or above 100% FPL, but IRS data showed income below FPL (the "contradictory-data DMI"). 90 Fed. Reg. at 27,124. This DMI was expected to cost the states $12.4 million in annual verification costs and $14.7 million in one-time system update costs, and to generate enrollment roadblocks for approximately 600,000 would-be enrollees annually. *See* 90 Fed. Reg. at 27,199 (2025 Rule impact estimate). Despite these harms, CMS claimed that "the process does not impose a substantial burden." 2025 Rule, 90 Fed. Reg. at 27,200.

58.     The *City of Columbus I* decision vacated both provisions, citing "circular reasoning and conclusory statements" that failed to justify the massive barrier to coverage these provisions would erect. *City of Columbus I*, 2026 U.S. Dist. LEXIS 130984 at *89-*90. The court also found—as did a 2021 decision blocking nearly identical provisions from taking effect during the first Trump Administration—that there was no evidence that this provision was necessary to combat fraud in the first place: "[I]f the agency cannot point to data that self-attestation meaningfully contributes to increased fraud, then the agency adopted an incongruent solution to the problem." *City of Columbus I*, 2026 U.S. Dist. LEXIS 130984 at *89, *citing City of Columbus v. Cochran*, 523 F. Supp. 3d 731, 762 (D. Md. 2021) (blocking nearly identical income verification provisions adopted in the rule entitled *Notice of Benefit and Payment Parameters for 2019*, 83 Fed. Reg. 16,930 (April 17, 2018)).

12

59.     With respect to both provisions, the *City of Columbus I* court found that Defendants "refused to meaningfully engage with challenges to the data and reports used to justify the Rule," and "lack[ed] meaningful explanation for the provision," thus rendering it arbitrary. *City of Columbus I*, 2026 U.S. Dist. LEXIS 130984 at *86, *90.

### C.      Shortening the Failure-to-Reconcile Window to One Year

60.     The ACA awards PTC to enrollees based on their projected future income. 26 U.S.C. § 36B; 42 U.S.C. § 18082. When an enrollee files income taxes with the federal government the following year, the amount of the PTC award that was claimed is reconciled against the enrollee's actual income as shown by their tax filings. 45 C.F.R. § 155.305(f)(4). An enrollee who fails to file taxes and reconcile their claimed PTC award against their actual eligibility for two consecutive years—the "FTR window"—loses their eligibility for future PTCs and may owe the government the amount of overpayment they received. *Id.*; 26 U.S.C. § 36B(f)(2).

61.     The 2025 Rule shortened the FTR window from two years to one year. The court in *City of Columbus I* vacated that provision in its entirety—not just the shortening of the window, but also the requirement to file and reconcile. *City of Columbus I*, 2026 U.S. Dist. LEXIS at *59-*65. The court found that the Affordable Care Act does not condition a consumer's eligibility for PTCs on whether they have filed taxes with the IRS. *See id.* at *63-*64 (agreeing that the ACA "does not contemplate that a prior tax debt affects an applicant's eligibility for APTCs in any way," and that "if Congress intended to condition eligibility for a tax credit on the reconciliation of old tax debts, it knew how to do so,") (internal quotation marks and citations omitted)); *see also* 42 U.S.C. § 18082(c)(2)(A) (requiring that PTC amounts "shall" be paid as directed by 26 U.S.C. § 36B, which does not permit nonpayment due to FTR status).

## ALLEGATIONS

I.      DEFENDANTS PROMULGATE THE NOTICE OF BENEFIT AND PAYMENT PARAMETERS FOR 2027, WHICH REPEATS ALREADY-VACATED PROVISIONS AND INTRODUCES ADDITIONAL UNLAWFUL PROVISIONS

62.     On May 20, 2026, Defendants published the final 2026 Rule. 91 Fed. Reg. 29,526.

13

The annual Notice of Benefit and Payment Parameters (NBPP), often known as payment rules, set payment rates, user fees, risk adjustment payments, and other major financial formulae used throughout the Affordable Care Act. The 2026 Rule, however, goes beyond those areas, and makes far more sweeping changes than those ordinarily contemplated in an NBPP.

63. The 2026 Rule repeats several of the provisions of the 2025 Rule, and its justifications this year fare no better.

64. The same federal district court that decided *City of Columbus I* has issued a new temporary stay of several of the 2026 Rule's provisions while the case is pending. *See City of Columbus v. Kennedy (City of Columbus II)*, 2026 U.S. Dist. LEXIS 157449, at *37-44 (D. Md. July 16, 2026).

65. Defendants predict that the 2026 Rule will cause up to two million ACA enrollees to lose their health insurance in plan year 2027, and that enrollment over the 2026-2030 period will be five million lower than it would have been without the 2026 Rule. 91 Fed. Reg. at 29,856.

## A. The Repeated Provisions

66. The 2026 Rule contains four provisions that are substantively identical to provisions from the 2025 Rule that were found to be unlawful and vacated by the court in *City of Columbus I*.

### 1. 75% Special Enrollment Period Verification

67. The 2026 Rule once again attempts to require the federal exchange to perform pre-enrollment verification on 75% of all enrollees who utilize the federal exchange's SEP. Consumers attempting to enroll via an SEP will have to verify their eligibility, often requiring them to submit additional information and documentation. The verification process must be completed before coverage can take effect. CMS estimates that this provision will reduce the amount of APTC paid to consumers by $105.4 million annually. 91 Fed. Reg. at 29,827.

68. This requirement will reduce health insurance coverage in states that utilize the FFE, including several Plaintiff States such as Arizona, Delaware, Michigan, and Wisconsin. CMS "agree[s]" that such exchanges will face an increased burden, 91 Fed. Reg. at 29,814, but claims that it is "unable to determine whether this burden contributes to consumers' foregoing

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

coverage through the Exchange." 91 Fed. Reg. at 29,633. But elsewhere, CMS acknowledges that, when a prior SEP verification program was in effect, fourteen percent of enrollees under that SEP—75,500 people—were unable to complete the verification process, and CMS does not allege that any of those 75,500 applications were fraudulent. 91 Fed. Reg. at 29,631.

69.     This makes sense because any administrative burden can delay or deter enrollment.[6] Adding even a "minor ordeal," such as a single "extra step," has been found to "reduce[] enrollment by 33 percent."[7]

70.     CMS's own data indicates that younger, healthier individuals complete SEP verification at much lower rates than older or sicker individuals, who are more motivated to maintain coverage. This results in a weaker risk pool. 91 Fed. Reg. 29,633, 29,838. Defendants also acknowledge that hundreds of thousands of consumers will have their "enrollment delayed or 'pended' annually until eligibility [verification] is completed." 91 Fed. Reg. at 29,838. Requiring consumers to navigate a complex documentation process, often during times of significant and sudden changes in their personal circumstances, will discourage eligible individuals from obtaining coverage.

71.     As with the 2025 Rule, the 2026 Rule points to no evidence to show that SEP enrollees are harming the risk pool through adverse selection. It says only that, when verification was implemented for some SEP categories but not others, consumers shifted away from the categories that required verification. 91 Fed. Reg. at 29,632. But that shows only that consumers, when given a choice, opt to complete less paperwork rather than more paperwork; it does not show that the verification process blocked otherwise fraudulent enrollments.

72.     Defendants claim the change will cause premiums to decline because the verification process will prevent ineligible enrollees from obtaining coverage, but that can only be true if: (1) consumers are waiting until they are sick to sign up for coverage through the SEP

---

[6] *See* Jason Levitis, Lindsey Murtagh, Sabrina Corlette, and Claire O'Brien, et al., Urban Inst. Comment Letter, CMS-2026-0496-0989, at 6 (March 13, 2026) (discussing research) (available at https://www.regulations.gov/comment/CMS-2026-0496-0989/.

[7] Mark Shepard & Myles Wagner, *Do Ordeals Work for Selection Markets? Evidence From Health Insurance Auto-Enrollment*, 115 AM. ECON. REV. 722, 822 (2025) (available at https://doi.org/10.1257/aer.20231133).

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

(which is known as "adverse selection"); and (2) these consumers cause the risk pool to be sicker (and therefore more costly), driving up premiums. But the 2026 Rule does not show that such adverse selection is occurring or that SEP enrollees are more costly to insure—and thus Defendants have not shown that blocking those enrollments will result in healthier risk pools.

73.    As with the 2025 Rule, the 2026 Rule cites no data supporting Defendants' stated view, and the record before the agency contained ample evidence to the contrary.[8] As the court found in *City of Columbus I*, "the agency's chosen solution is unmoored from the problem it seeks to address. . . . Defendants have offered no current data, reports, or evidence establishing that any 'misuse and abuse' of SEPs stems from SEP enrollment *in particular*." 2026 U.S. Dist. LEXIS 130984 at *52-*53 (internal citation omitted; emphasis in original).

### 2.    The Two Income Verification Provisions

74.    Despite similar provisions being invalidated by federal courts twice before, the 2026 Rule again requires exchanges to generate and resolve a DMI when an applicant attests to income at or above 100 percent of the federal poverty level, but IRS data shows income below that threshold. 91 Fed. Reg. at 29,613. CMS expects this provision to generate 340,000 DMIs for people on the federal exchange and 208,000 DMIs for people on the state exchanges, and to reduce APTC expenditures by $213 million annually, beginning in 2027. 91 Fed. Reg. at 29,813, 29,836.

75.    The 2026 Rule also seeks to implement the missing-data DMI for a third time. This year, Defendants predict that approximately 1.7 million people on the federal exchange and 1 million people on the state exchanges will have to resolve a DMI due to the missing-data provision, and that APTC payments to low-income enrollees will decrease by $1.069 billion annually starting in 2027 due to this provision. 91 Fed. Reg. at 29,813, 29,836-37.

76.    Neither provision is justified. CMS supports these two income-verification provisions by reference to much of the same flawed analysis that doomed the 2025 Rule on this point. The two DMI provisions together will generate over 2 million DMIs on the federal

---

[8] Levitis, et al., *supra* note 6, at 25-26 (CMS provides "no basis" for this change).

16

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

exchange, and another 1.26 million on the state exchanges. 91 Fed. Reg. at 29,813. Despite acknowledging that these administrative burdens will impact over 3 million consumers, CMS dismisses this number as "minimal" and brushes aside the concern "that some consumers may end up having their financial assistance reduced or removed, resulting in coverage loss and financial burden." 91 Fed. Reg. at 29,616. CMS also deems "the administrative burden of submitting documents" to be "minimal," 91 Fed. Reg. at 29,616, without justification.

77. In addition to the substantial compliance costs that these DMIs will foist upon consumers, there will be additional harm to the states from sicker risk pools and more uninsured residents (and therefore higher uncompensated care costs). As healthier and younger enrollees—who seek healthcare less frequently and so are less motivated to complete the verification process in order to maintain coverage—drop out of the risk pool, the remaining population will skew older and sicker, worsening the risk pool and raising costs for consumers. As the rate of insurance coverage declines, uncompensated care costs borne by the states will increase.

78. Moreover, Defendants fail to address the concern that this provision might generate DMIs for consumers whose data is not in fact missing, but whose tax file might not be immediately linked to them due to a change in last name, family composition, or filing status, or simply because the enrollee was not previously required to file taxes. 91 Fed. Reg. at 29,620. Indeed, the low-income enrollees most likely to be flagged for a DMI might not have other documentation to verify their income readily available. *See City of Columbus I*, 2026 U.S. Dist. LEXIS 130984 at *89-*90 (acknowledging the concerns regarding enrollees with less consistent employment, such as gig-economy workers and those who otherwise lack ready access to pay stubs or W-2 forms).

79. CMS estimated that the contradictory-data provision will cost the state-based exchanges $12.3 million and 249,600 hours annually, and the missing-data provision will cost the state-based exchanges $62.7 million and 1,267,200 hours annually. 91 Fed. Reg. at 29,813.

80. The only rationale that CMS provides is "the ongoing need to strengthen program integrity and protect enrollees from accumulating tax liabilities." 91 Fed. Reg. at 29,615. However, once again, there is a profound mismatch between the stated problem and the proposed

17

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

solution. To the extent that that Defendants have identified any fraud on the ACA exchanges, it has come almost entirely from rogue agents and brokers enrolling consumers without their knowledge or consent. *See id.* (pointing to a recent U.S. Government Accountability Office study that flags "negative impacts" on the health of the exchanges "resulting from unauthorized enrollment change from agents, brokers, and web brokers"). The 2026 Rule points to no data supporting the notion that significant numbers of consumers are misrepresenting their income to fraudulently qualify for subsidies.

### 3.    Failure to Reconcile

81.    The 2026 Rule imposes a mandatory one-year FTR window in states utilizing the federal exchange beginning in 2027 and permits the state exchanges to adopt the one-year window if they choose before imposing it for all states in 2028 and beyond. 91 Fed. Reg. at 29,534, 29,606-07. CMS claims that the provision is now lawful because Congress last year passed legislation that, for the first time, endorses the FTR policy and requires a one-year FTR window—but the law takes effect starting only in 2028, not 2027. Pub. L. No. 119-21 § 71303, 139 Stat. 72, 323 (2025). CMS jumps the gun by attempting to require implementation of the one-year FTR window for FFE and SBE-FP states in 2027, before Congressional authorization to do so takes effect. *Id.*, 91 Fed. Reg. at 29,606-08.

82.    The 2026 Rule's FTR provision as applied to plan year 2027 remains unlawful for the same reasons articulated in *City of Columbus*, 2026 U.S. Dist. LEXIS 130984 at *64 ("Because the plain text of the statute contradicts the agency's provision, the Court concludes that the failure-to-reconcile provision is contrary to law.").

83.    Despite acknowledging that last year's FTR policy was meant to be for 2026 only, CMS attempts to justify re-imposing this policy for 2027 by claiming, without evidence, that "there remains a substantial number of unauthorized enrollments on the Federal platform." 91 Fed. Reg. at 29,608.

84.    Nor has CMS acknowledged the harm to the states caused by the change in position: states with a two-year FTR window pre-2025 had to adopt a one-year window, plan for the sunset provision to revert to a two-year window for 2027, expect to re-adopt a one-year

18

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

window as required by Congress starting in 2028, only to be told that CMS is actually imposing the one-year window on states that utilize the federal exchange beginning in 2027 after all. Each of those changes to programming would be costly: last year, CMS estimated "one-time" costs to the state exchanges of $19.4 million due to this reprogramming. 90 Fed. Reg. at 27,189. In fact, the costs are far higher, due to the on-again, off-again nature of this policy.

85.     The one-year FTR risks eligible individuals losing access to PTCs due to administrative errors and paperwork delays. CMS previously acknowledged that "IRS processing delays" were a valid reason to suspend eligibility checks, because otherwise consumers "who had filed and reconciled" might nonetheless "lose APTC" through no fault of their own. 90 Fed. Reg. 12,958.

86.     The concern about IRS processing delays remains relevant to the 2026 Rule. In fact, a recent report from the Inspector General of the U.S. Department of the Treasury has found those problems are getting worse: outstanding inventory backlog, including unprocessed tax returns, has more than doubled from 871,000 in December 2019 to two million in December 2025 "due to efforts to reduce staff" undertaken by the Trump Administration.[9]

**B.     The New Provisions**

**1.     Expanded Eligibility for Catastrophic-Plan Eligibility**

87.     The 2026 Rule dramatically expands eligibility for enrollment in catastrophic plans. As explained above, catastrophic plans are barebones health insurance plans that provide very little coverage, with very high out-of-pocket costs and, as a result, low premiums. However, the PTCs that the ACA makes available to enrollees in metal-tier plans cannot be used to pay catastrophic-plan premiums.

88.     The ACA intended catastrophic plans to be used narrowly. The statute allows enrollment in catastrophic plans only for those under the age of 30 or those exempt from the individual mandate due to hardship or because coverage is unaffordable. 42 U.S.C. §§

---

[9] Diana M. Tengesdal, Memorandum for the Commissioner of Internal Revenue, U.S. Department of the Treasury, *The Internal Revenue Service's Readiness for the 2026 Filing Season (Audit No. 2026400002)*, at 1-2 (Jan. 26, 2026) (available at https://tigta.gov/sites/default/files/reports/2026-01/2026400002-Readiness-Memo.pdf).

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

18022(e)(2).

89.     CMS regulations have long interpreted "hardship" to mean circumstances that might prevent an individual from being able to enroll in more comprehensive metal-tier coverage: *e.g.*, homelessness, domestic violence, bankruptcy, or natural disasters.

90.     However, the 2026 Rule vastly expands eligibility for catastrophic plans. Rather than confining eligibility to the narrow categories set forth in the ACA's text, the 2026 Rule makes everyone, nationwide, eligible for a hardship exemption granting access to catastrophic-plan enrollment so long as their income is below 100% FPL or above 250% FPL.

91.     Approximately eighty percent of all American adults under the age of 65 would qualify for catastrophic-plan coverage under this new standard.[10]

92.     Last year, the White House Council of Economic Advisors predicted that, under the dramatically expanded eligibility criteria, enrollment in catastrophic plans would spike from 54,000 people to 3,000,000.[11]

93.     Three Plaintiff States' exchanges process their own hardship exemption requests: California, Connecticut, and Maryland. Those Plaintiff States will shoulder the cost of processing many more exemption requests under the new criteria. Defendants estimate that this will cost those States approximately $17,000 per year, per exchange, based on an estimated 1,072 additional applications per state each year, on average. 91 Fed. Reg. at 29,815.

94.     Expanding the eligibility criteria to include eighty percent of all Americans under the age of 65 stretches Defendants' regulatory authority beyond the bounds of the ACA's text.

95.     The 2026 Rule also fails to justify this change. Catastrophic plans are ineligible for premium tax credits and offer much less coverage with much higher out-of-pocket maximum costs than metal-tier plans. This could have two effects. First, some enrollees might be tempted to switch from a metal-tier plan to a catastrophic plan, attracted by the lower premiums. Individuals

---

[10] Levitis, et al., *supra* note 6, at 41.

[11] The Council of Economic Advisors, *Expansion of HAS Eligibility Under OBBB Act to Improve Marketplace Coverage, Affordability, and Access* (Sept. 2025), https://www.whitehouse.gov/wp-content/uploads/2025/09/Expansion-of-HSA-Eligibility-Under-OBBA-1.pdf

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

in that group would likely be healthier—*i.e.*, less likely to utilize healthcare—and therefore likely younger. This would concentrate risk in the population that remains in the metal-tier plans, raising premiums and destabilizing the individual market. Second, some enrollees might sign up for a catastrophic plan without realizing the barebones nature of the coverage. CMS failed to adequately address these concerns. 91 Fed. Reg. at 29,639-41 (expansion of eligibility for catastrophic plans merely "expands consumer choice" and "does not create disparate advantage for catastrophic plans over metal level plans in any way.")

**2.      Allowing MOOPs Beyond the Statutory Maximum for Catastrophic and Bronze-Tier Plans**

96.      Under existing law, to protect patients, the ACA places strict limits on "cost-sharing," which is the maximum amount a patient will spend on covered medical costs. The statute sets out the formula to calculate the MOOP limit that a plan can impose on patients to protect them from excessive costs due to medical emergencies or expensive treatments such as chemotherapy. *See* 42 U.S.C. § 18022(c)(1), (4).

97.      Under the statutory formula used by CMS to set the MOOP, the limits on out-of-pocket spending would be $12,000 for an individual plan or $24,000 for a family in plan year 2027. *See* 2026 Rule, 91 Fed. Reg. at 29,692 (limit for self-only coverage in PY 2027 is $12,000); *see also* 42 U.S.C. § 18022(c)(1)(B)(ii) (for other than self-only coverage, the limit is doubled).

98.      The 2026 Rule, however, permits bronze plans to offer cost-sharing that exceeds the statutory annual MOOP established by the ACA. 91 Fed. Reg. at 29,697-99. Specifically, the 2026 Rule "narrow[s] the flexibility proposed for individual market bronze plans such that these bronze plans are permitted to exceed the standard annual limitation on cost sharing by up to 130 percent of the standard annual limitation on cost sharing" as long as the insurer offers at least one bronze plan that complies with the statutory limitation. *Id.* This flatly contradicts the statutory text. *See* 42 U.S.C. § 18022(c)(1)(A) (establishing cost-sharing limits).

99.      CMS claims that this allowance is necessary because it will at some point become mathematically impossible for insurers to design bronze-tier plans that comply with the MOOP while simultaneously complying with the bronze tier's 60% actuarial value target. 91 Fed. Reg. at

21

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

29,691. But that point is not here yet—as CMS admits. The 2026 Rule purports to allow insurers to offer a noncompliant bronze-tier plan only if they simultaneously offer a *compliant* bronze-tier plan in the same market. 91 Fed. Reg. at 29,697. It is arbitrary and capricious, not to mention nonsensical and confusing, for the agency to permit insurers to violate the law on the basis that compliance is impossible, while simultaneously recognizing that compliance *remains* possible.

100.    Commenters on the 2026 Rule pointed out that, rather than allowing insurers to exceed the MOOP cap, CMS could make other changes to provisions within its regulatory authority.[12] CMS ignored them. Nor does CMS explain why updating the actuarial value standards would be insufficient for bronze plans to comply with the statutory MOOP limits.

101.    As described above, catastrophic plans are extremely limited health insurance plans that afford enrollees minimal coverage until the consumer has incurred significant out of pocket costs. Section 1302(e)(1)(B) of the ACA explicitly requires that catastrophic plans must comply with the same "annual limitation [on cost-sharing]" that governs all other ACA plans. *See* 42 U.S.C. § 18022(e)(1)(B) (requiring compliance with 42 U.S.C. § 18022(c)(1)).

102.    Despite the statutory command, the 2026 Rule requires catastrophic plans to have MOOP limits of 130 percent of the statutory annual maximum limit established by the ACA, before covering any care other than preventive services and three primary care visits. 91 Fed. Reg. at 29,687 n.258; 29,689.

103.    The 2026 Rule conflicts with the plain text of the ACA, which establishes annual limits on cost-sharing for qualified health plans, 42 U.S.C. § 18022(c), and explicitly requires catastrophic plans to comply with the "annual limitation [on cost-sharing] in effect under subsection (c)(1)" of Section 1302 of the ACA. 42 U.S.C. § 18022(e)(1)(B).

104.    CMS also fails to provide an adequate evidentiary basis for this policy, and it fails to explain why increasing the MOOP cap for catastrophic plans is necessary. Unlike bronze-tier plans, catastrophic plans do not have to meet an actuarial value target. 42 U.S.C. § 18022(e). CMS merely notes that, by requiring catastrophic-plan MOOPs to exceed the ACA cap by thirty

---

[12] Levitis, et al., *supra* note 6, at 39.

22

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

percent, catastrophic plans might "generally" target an actuarial value of "approximately 55 percent." 91 Fed. Reg. at 29,706. But because there is no requirement that catastrophic plans actually achieve an actuarial value of 55 percent, this is an arbitrary basis for allowing insurers to offer plans with unlawfully high MOOPs.

## II.   THE 2026 RULE HARMS THE STATES

105.   The challenged provisions of the 2026 Rule will harm individual consumers, state and local governments, and public healthcare providers. Defendants estimate that up to five million fewer people will enroll over the period 2026-2030 than would have enrolled but for the 2026 Rule, and that two million of those enrollment losses will occur in 2027. 91 Fed. Reg. at 29,856. As enrollment drops, the financial burden of uncompensated medical care falls on the states.

106.   All provisions that add roadblocks that can prevent enrollees from signing up for health insurance—the special enrollment period verification requirement, the failure-to-reconcile provision, and the two income-verification provisions—burden the Plaintiff States. First, states utilizing the federal exchange will face higher uncompensated care costs as the SEP verification requirement lowers insurance enrollment in those states. Second, the states will incur an estimated $19.4 million in costs in 2027 to implement the FTR provisions. *See* 91 Fed. Reg. at 29,825. Third, the aggregate effect of all challenged provisions will be to decrease enrollment on the exchanges, with losses concentrated among comparatively healthier and younger enrollees, harming the ACA risk pool and driving up premiums as a result.

107.   Expanding access to catastrophic plans beyond the limits established by the ACA will harm the risk pool by siphoning healthier enrollees away from metal-tier plans. This will cause premiums in the metal-tier plans to increase, driving further coverage losses concentrated among healthier enrollees and leaving states with higher uncompensated care costs when newly uninsured (or underinsured) individuals seek healthcare.

108.   Similarly, increasing MOOP limits beyond the statutory maximum authorized by the ACA will expose consumers to financial harm that the ACA was designed to prevent. Consumers with unlawfully high MOOP limits will need care they may not be able to afford, and

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

the burden of uncompensated care will fall on the Plaintiff States to cover.

## CAUSES OF ACTION

## COUNT ONE

## ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A)

## ARBITRARY AND CAPRICIOUS AGENCY ACTION

109. Plaintiff States reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

110. The 2026 Rule is a "final agency action for which there is no other adequate remedy in a court" and is subject to judicial review. 5 U.S.C. § 704.

111. The Administrative Procedure Act requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

112. As discussed above, Defendants failed to provide adequate reasons for numerous changes that the 2026 Rule imposes, failed to justify reversing their own previous representations and conclusions, failed to consider how the changes will impact consumers, and failed to meaningfully respond to comments about those proposed changes. The following changes were not "reasonable or reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 417 (2021), and should be vacated as arbitrary and capricious under Section 706(2)(A) of the APA:

      a. The 2026 Rule's revisions to 45 C.F.R. § 155.420(g), requiring that States utilizing the federal exchange conduct pre-enrollment eligibility verification for at least 75% of special enrollment period enrollees, across all eligibility types;

      b. The 2026 Rule's revisions to the income verification provisions at 45 C.F.R. § 155.320(c)(3)(iii)(A) and (c)(3)(vi)(C)(2), which include a requirement that Exchanges generate and resolve a data-matching issue if either existing federal tax data shows a lower income than an enrollee's projected annual household income at or above 100% of the federal poverty level or if there is no federal tax data available;

      c. The 2026 Rule's revisions to 45 C.F.R. § 155.305(f), including the Rule's revisions to 45 C.F.R. § 155.305(f)(4), pertaining to the failure-to-reconcile policy;

24

d.      The 2026 Rule's addition of 45 C.F.R. § 155.605(d)(1)(iv), which expands eligibility for catastrophic-plan coverage to anyone whose household income is below 100% or above 250% of the federal poverty level; and

e.      The 2026 Rule's revisions to 45 C.F.R. §§ 156.155(a)(3) and 156.130(a)(2) and addition of 45 C.F.R. § 156.136, which expand the maximum out-of-pocket cost caps beyond the limits established by the ACA for catastrophic plans and bronze plans.

113.    These provisions of the 2026 Rule are arbitrary and capricious. Pursuant to 5 U.S.C. § 706(2)(A), Plaintiff States are entitled to an order vacating those provisions of the Rule and enjoining their implementation as to Plaintiff States.

114.    The 2026 Rule will cause harm to Plaintiff States.

**COUNT TWO**

**ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A), (C)**

**AGENCY ACTION CONTRARY TO LAW**

115.    Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

116.    The 2026 Rule is a "final agency action for which there is no other adequate remedy in a court" and is subject to judicial review. 5 U.S.C. § 704.

117.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

118.    Several of the 2026 Rule's provisions violate the ACA and other federal statutes and regulations and therefore are "in excess of statutory jurisdiction" or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

a.      The failure-to-reconcile policy at 45 C.F.R. § 155.305(f)(4), including the 2026 Rule's revisions to 45 C.F.R. § 155.305(f)(4), is contrary to 42 U.S.C. § 18082 and to 26 U.S.C. § 36B(a) and (c), which guarantees access to premium tax credits so long as the enrollee qualifies as an "applicable taxpayer";

b.      The 2026 Rule's addition of 45 C.F.R. § 155.605(d)(1)(iv), which expands

25

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

eligibility for catastrophic plan coverage to anyone whose household income is below 100%, or above 250%, of the federal poverty level, is contrary to 42 U.S.C. § 18022(e), which sets limitations on eligibility for such plans; and

    c.    The 2026 Rule's revisions to 45 C.F.R. § 155.155(a)(3) and addition of 45 C.F.R. § 156.136, which expand the maximum out-of-pocket cost caps beyond the limits established by the ACA for bronze plans and catastrophic plans, respectively, are contrary to 42 U.S.C. § 18022(c) and (e), which set those limits by statute.

119.    These provisions of the 2026 Rule are contrary to law. Pursuant to 5 U.S.C. § 706(2)(C), Plaintiff States are entitled to an order vacating those provisions of the Rule and enjoining their implementation as to Plaintiff States.

120.    These provisions, individually and collectively, also violate Section 1554 of the ACA, which bars CMS from issuing any rule that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care." 42 U.S.C. § 18114.

121.    The 2026 Rule will cause harm to Plaintiff States.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

122.    Declare that the provisions of the 2026 Rule identified in Counts One and Two are arbitrary, capricious, without observance of proper procedure, or otherwise not in accordance with law under the Administrative Procedure Act, 5 U.S.C. § 706(2);

123.    Vacate and set aside the provisions of the 2026 Rule identified in Counts One and Two under the APA;

124.    Permanently enjoin Defendants from imposing the provisions of the 2026 Rule identified in Counts One and Two, or substantively identical provisions, on Plaintiff States; and

125.    Grant such other and further relief as the Court may deem just and proper.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Dated:  July 31, 2026

**JENNIFER DAVENPORT**
**Attorney General**
**State of New Jersey**

By: */s/ Mayur P. Saxena*
JEREMY M. FEIGENBAUM*
Solicitor General
MAYUR P. SAXENA*
Assistant Attorney General
JOSHUA P. BOHN*
BRYCE K. HURST
AMANDA I. MOREJON*
ESTEFANIA PUGLIESE-SAVILLE*
Deputy Attorneys General
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 969-5365
Mayur.Saxena@law.njoag.gov

*Attorneys for the State of New Jersey*

**KRISTIN K. MAYES**
**Attorney General of Arizona**

By: */s/ Syreeta A. Tyrell*
HAYLEIGH S. CRAWFORD*
Deputy Solicitor General
SYREETA A. TYRELL*
Senior Litigation Counsel
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Hayleigh.Crawford@azag.gov
Syreeta.Tyrell@azag.gov
ACL@azag.gov

*Attorneys for the State of Arizona*

Respectfully submitted,

**ROB BONTA**
**Attorney General of California**
NELI PALMA
Senior Assistant Attorney General
NIMROD PITSKER ELIAS
Supervising Deputy Attorney General

By: */s/ Sean C. McGuire*
SEAN C. MCGUIRE
HILARY A. BURKE CHAN
MARNIE G. GANOTIS
Deputy Attorneys General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9543
Sean.McGuire@doj.ca.gov

*Attorneys for the State of California*

**PHIL WEISER**
**Attorney General of Colorado**

By: */s/ Reed W. Morgan*
DAVID MOSKOWITZ*
*Deputy Solicitor General*
REED W. MORGAN*
*Assistant Solicitor General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov
reed.morgan@coag.gov

*Counsel for the State of Colorado*

27

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**WILLIAM TONG**
**Attorney General of Connecticut**

By: */s/ Ashley Meskill*
ASHLEY MESKILL*
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5270
Ashley.Meskill@ct.gov

*Attorneys for the State of Connecticut*

**KATHLEEN JENNINGS**
**Attorney General of the State of Delaware**

By: */s/ Vanessa L. Kassab*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

**KWAME RAOUL**
**Attorney General of the State of Illinois**

By: */s/ Alice L. Riechers*
SARAH J. NORTH*
Deputy Chief, Public Interest Division
ALICE L. RIECHERS*
Senior Assistant Attorney General, Special Litigation
ELIZABETH SCOTT*
Assistant Attorney General, Special Litigation
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, IL 60603
(312) 814-3000
Sarah.North@ilag.gov
Alice.Riechers@ilag.gov
Elizabeth.Scott@ilag.gov

*Attorneys for the State of Illinois*

**AARON M. FREY**
**Attorney General**
**State of Maine**

By: */s/ Molly Moynihan*
MOLLY MOYNIHAN*
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
molly.moynihan@maine.gov

*Attorneys for the State of Maine*

**ANTHONY G. BROWN**
**Attorney General of Maryland**

By: */s/ Lauren Gorodetsky*
LAUREN GORODETSKY*
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-7057
lgorodetsky@oag.maryland.gov

*Counsel for the State of Maryland*

**ANDREA JOY CAMPBELL**
**Attorney General of Massachusetts**

By: */s/ Sandra Wolitzky*
SANDRA WOLITZKY*
Senior Health Policy Advisor
MICHAEL W. WONG*
Assistant Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2030
sandra.wolitzky@mass.gov
michael.w.wong@mass.gov

*Counsel for the Commonwealth of Massachusetts*

28

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**DANA NESSEL**
**Attorney General of Michigan**

By: */s/ Neil Giovanatti*
NEIL GIOVANATTI*
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*
**AARON D. FORD**
**Attorney General of Nevada**

By: /s/ K. Brunetti Ireland
K. BRUNETTI IRELAND (Cal. Bar No. 316287)
Chief of Special Litigation
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Counsel for the State of Nevada*


**LETITIA JAMES**
**Attorney General of New York**

By: /s/ Arjun Mody
RABIA MUQADDAM*
*Chief Counsel for Federal Initiatives*
ARJUN MODY*
*Special Counsel*
28 Liberty Street
New York, NY 10005
(646) 729-0295
arjun.mody@ag.ny.gov

*Attorneys for the State of New York*


**KEITH ELLISON**
**Attorney General**
**State of Minnesota**

By: */s/ Lindsey E. Middlecamp*
LINDSEY E. MIDDLECAMP*
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0711
Lindsey.middlecamp@ag.state.mn.us

*Attorneys for the State of Minnesota*
**RAÚL TORREZ**
**New Mexico Attorney General**

By: */s/ Ben Osborn*
BEN OSBORN*
Senior Counsel
Impact Litigation Division
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
(505) 917-5588
BOsborn@nmdoj.gov

*Attorneys for the State of New Mexico*


**DAN RAYFIELD**
**Attorney General of Oregon**

By: */s/ Scott P. Kennedy*
SCOTT P. KENNEDY*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: (971) 453-9050
Fax: (971) 673-5000
Scott.Kennedy@doj.oregon.gov

*Attorneys for the State of Oregon*

29

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**JOSH SHAPIRO,**
**In his official capacity as Governor of the**
**Commonwealth of Pennsylvania**

By: /s/ *Michael J. Fischer*
JENNIFER SELBER*
GENERAL COUNSEL
MICHAEL J. FISCHER*
Executive Deputy General Counsel
AIMEE D. THOMSON*
Deputy Attorney General
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 831-2847
mjfischer@pa.gov

*Counsel for Governor Josh Shapiro*

**PETER F. NERONHA**
**Attorney General of Rhode Island**

By: /s/ *Jordan Broadbent*
JORDAN BROADBENT*
Special Assistant Attorney General
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2060
jbroadbent@riag.ri.gov

*Attorney for the State of Rhode Island*

**CHARITY R. CLARK**
**Attorney General**
**State of Vermont**

By: /s/ *Jonathan T. Rose*
Jonathan T. Rose
Solicitor General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
jonathan.rose@vermont.gov

*Attorneys for the State of Vermont*

**JAY JONES**
**Attorney General of Virginia**

By: /s/ *Megan C. Keenan*
MEGAN C. KEENAN*
Deputy Solicitor General
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

**NICHOLAS W. BROWN**
**Attorney General of Washington**

By: /s/ *William McGinty*
WILLIAM MCGINTY*, WSBA #41868
JULIE C. MORONEY*, WSBA #59017
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
william.mcginty@atg.wa.gov
julie.moroney@atg.wa.gov

*Attorneys for the State of Washington*

**JOSHUA L. KAUL**
**Attorney General of the State of**
**Wisconsin**

By: /s/ *Jody J. Schmelzer*
JODY J. SCHMELZER*
Assistant Attorney General
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707
(608) 266-3094
jody.schmelzer@wisdoj.gov

*Counsel for the State of Wisconsin*

*Indicates pro hac vice application forthcoming

30

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**